IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SAMETHA GLEN, SIDNEY DAVIS, and CRYSTAL MORRIS, individually and on behalf of all persons similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GALARDI SOUTH ENTERPRISES, INC., GALARDI SOUTH ENTERPRISES CONSULTING, INC., PONY TAIL, INC. d/b/a ONYX, TROP INC. d/b/a PINK PONY, TERRI GALARDI, MICHAEL KAPP, and DENNIS WILLIAMS, <br><br> Defendants. | 1:13-cv-3670-WSD |

## OPINION AND ORDER

This matter is before the Court on Plaintiffs Sametha Glen's ("Glen"), Sidney Davis's ("Davis") and Crystal Morris's ("Morris") ("Plaintiffs") Emergency Motion for a Temporary Restraining Order ("TRO"), Preliminary Injunction and Hearing Pursuant to Local Rule 7.2(B) [89], and following the hearing on the TRO that was conducted on June 2, 2015.

## I.  BACKGROUND

### A.  Facts

#### 1.  *Factual Allegations of the Complaint*

On November 6, 2013, Plaintiffs filed their Complaint, alleging that Defendants violated 29 U.S.C. §§ 206 and 207 of the Fair Labor Standards Act ("FLSA") for failing to pay the minimum wage or overtime wages to Plaintiffs and others similarly situated.  On December 11, 2014, Plaintiffs filed their First Amended Complaint against Defendants.  On March 23, 2015, the Court allowed Plaintiffs to file a Second Amended Complaint to add Crystal Morris as a Plaintiff, and Trop Inc. ("Trop") and Dennis Williams ("Williams") as Defendants.

In the Second Amended Complaint, Plaintiffs allege that Glen and Davis are currently employees of Onyx, and Morris is a former employee of Pink Pony, adult entertainment clubs located in Atlanta, Georgia.  Plaintiffs allege that Defendant Terri Galardi ("Galardi") is the controlling shareholder and exerts day-to-day operational and management control over Galardi South Enterprises, Inc. ("GSE"), Galardi South Enterprises Consulting, Inc. ("GSEC"), Pony Tail, Inc. ("Pony Tail") and Trop.  Pony Tail is the entity through which GSE and GSEC own and manage Onyx, and Trop is the entity through which GSE and GSEC own and manage the Pink Pony.  Plaintiffs allege that Michael Kapp is the Chief

Operating Officer of GSEC and directs the day-to-day operations of Pony Tail and Onyx. Plaintiffs allege that Williams is the Chief Financial Officer ("CFO") and Secretary of Trop and Pony Tail, the CFO of GSEC, the Secretary of GSE, and the general manager of Pink Pony.

Plaintiffs allege that Defendants employ adult entertainers at their nightclubs, and that Defendants classify these entertainers as independent contractors to avoid paying wages and overtime. Plaintiffs allege that they are employees covered by the FLSA because Defendants do not require the adult entertainers to have any specialized background. Plaintiffs also claim that they are employees because Defendants (1) establish their specific work schedules; (2) require them to dance at specified times and in a specific manner on stage and for customers; (3) control their attire and interactions with customers; (4) set the price the entertainers are allowed to charge for dances; (5) require them to attend meetings at Defendants' business; and (6) enforce uniform written guidelines and policies governing their conduct at Defendants' clubs.

Plaintiffs allege further that Defendants require them to pay Defendants a portion of their tips, referred to as a "tip out" or "bar fee" for each shift worked.[1] If

---

[1] The tip fees are apparently distributed to the club DJ, bar staff, security, and other staff, and "house moms" who apparently are women who work with the entertainers.

entertainers are late for a shift, fail to appear for a shift, or otherwise violate Defendants' policies, they are charged additional fees or fines.  Plaintiffs allege that these bar and other fees, and the fines, are unlawful kickbacks under the FLSA.  Plaintiffs claim they and other entertainers were not paid wages for their work, did not receive overtime wages when they worked more than forty (40) hours per week, and are not considered exempt employees under the FLSA.  Plaintiffs seek to assert a collective action against the Defendants, on behalf of all current and former entertainers who worked at Onyx and Pink Pony.[2]

        2.      *Facts Related to the Current Dispute*

In April 2014, Netasha Spencer, an adult entertainer at Onyx, and Angie Baker and Christine Rybka, adult entertainers at Pink Pony (collectively the "Opt-in Plaintiffs") opted into this action as Plaintiffs.  In May 2015, Defendants told the Opt-in Plaintiffs that they are required to sign an employment agreement entitled "ENTERTAINER ELECTION FOR COMPENSATION" (the "Employment Agreement") if they want to continue working as adult entertainers at Onyx and Pink Pony.  See Spencer Decl., Ex. A at 1.  The Employment Agreement classifies the Opt-in Plaintiffs as W-2 employees, entitles them to compensation in the form of direct wages at a rate of $2.13 per hour,

---

[2] The Court has not yet determined whether conditional certification is appropriate for this action.

allows them to retain tips earned during on-stage performances, and to receive forty percent (40%) of the tips earned during off-stage performances, including lap dances on the house floor, and in private rooms. Id. at 2. The Employment Agreement also (i) requires the Opt-in Plaintiffs to follow a work schedule determined by Defendants, (ii) recognizes them as "skilled in the discipline of dance," and (iii) contains a non-compete clause prohibiting them from working at "competitive clubs." Id. at 1-2.[3] The Employment Agreement does not require the Opt-in Plaintiffs to pay a house fee to the clubs or to tip the DJ, bar staff, house moms, floor staff and security.

The Opt-in Plaintiffs allege that the Employment Agreement adversely affects the conditions of their employment, including because only they, and not other entertainers at the club, are required to sign the Employment Agreement to continue working at the clubs.[4] In short, Plaintiffs allege that those entertainers who did not opt-in to this action are given the choice of retaining their status as independent contractors or signing the Employment Agreement.

---

[3] The Opt-in Plaintiffs claim the non-compete clause is facially unenforceable under Georgia law because it is not geographically or temporally limited.

[4] Independent contractors are allowed to keep 100% of their tips for off-stage dances after "tip out" fees and fines, may "book" their preferred schedule and may work at competitive clubs.

On May 22, 2015, the Opt-in Plaintiffs filed an Emergency Motion for a TRO, Preliminary Injunction and Hearing Pursuant to the Court's Local Rule 7.2(b).  The Opt-in Plaintiffs contend that Defendants retaliated against them for opting-in to this action by reducing their compensation, materially altering the terms and conditions of their employment, and depriving them of employment opportunities at other clubs.

On June 1, 2015, Defendants filed their Response to the Emergency Motion. Defendants contend that they reclassified the Opt-in Plaintiffs as employees and changed their compensation method in a "good faith" effort to respond to their demand that they be treated as employees for purposes of the FLSA.  Defendants argue further that offering the Employment Agreement provides the Opt-in Plaintiffs "with working terms and conditions consistent with the relief they seek in their Second Amended Complaint." See Defs.' Resp. at 4-5.[5]  Defendants characterize their actions as "remedial measure[s], intended to accommodate Plaintiffs' [demands], by allowing them to be treated as tipped employees, and offering them the same working conditions that Defendants offer to other individuals whom Defendants acknowledge to be bona fide tipped employees such as its bartenders and wait staff." Id. at 5.  Defendants argue that injunctive relief

---

[5] On May 22, 2015, Plaintiffs moved to file a Third Amended Complaint to add a claim for retaliation.

6

should be denied because, among other things, the Opt-in Plaintiffs have failed to show a materially adverse change in the terms and conditions of their relationship with the entertainment clubs. Defendants specifically claim that, even though the Employment Agreement reduces the amount of compensation for off-stage dances, the difference is "offset" by a guaranteed hourly wage and the elimination of a prior requirement to share compensation with the clubs, the DJ, bar staff, house moms, floor staff, and security.

On June 2, 2015, the Court held a hearing on the Emergency Motion.

## II.   DISCUSSION

### A.   Legal Standard

To be eligible for a temporary restraining order or preliminary injunctive relief under Rule 65 of the Federal Rules of Civil Procedure, a movant must show: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest. See Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225-26 (11th Cir. 2005); Parker v. State Bd. of Pardons and Paroles, 275 F.3d 1032, 1034-35 (11th Cir. 2001). Preliminary injunctive relief is a drastic and extraordinary remedy which should not be granted unless the movant

can clearly establish each of the four elements. Four Seasons Hotels & Resorts v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003).

The elements for a TRO are essentially the same as for a preliminary injunction, except that "[t]he motion must be supported by allegations . . . that such [irreparable] injury is so imminent that notice and hearing would be impractical if not impossible." Hernandez v. Bd. of Regents, No. 96-1051-CIV-T-17B, 1997 WL 391800, *1 (M.D. Fla. July 7, 1997) (quoting Chase Manhattan Bank v. Dime Savings Bank of New York, 961 F. Supp. 275, 276 (M.D. Fla. 1997)). TROs are "designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction." 11A Wright & Miller, Federal Practice & Procedure: Civ. 2d § 2951.

    B.    Analysis

        *1.    Retaliation Claims Under FLSA*

Under 29 U.S.C. § 215(a)(3) of the FLSA, it is unlawful to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to" a plaintiff's FLSA claims. See 29 U.S.C. § 215(a)(3). Retaliation claims under the FLSA are analyzed using the McDonnell Douglas framework applied in retaliation cases under Title VII, the ADEA and the ADA. To establish

a *prima facie* case of retaliation under FLSA, a plaintiff must show that: (1) she engaged in activity protected under the act; (2) she subsequently suffered an adverse action by the employer, and (3) a causal connection exists between the employee's protected activity and the adverse action.  See Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342 (11th Cir. 2000).  The failure to show any of these three elements is fatal to a *prima facie* case of retaliation under FLSA.  Id.

If a plaintiff makes a *prima facie case*, the burden shifts to the employer to articulate a non-retaliatory reason for the adverse action.  "If the employer asserts a legitimate reason for the adverse action, the plaintiff may attempt to show pretext. []  In demonstrating causation, the plaintiff must prove that the adverse action would not have been taken but for the assertion of FLSA rights."  Id. (citing Reich v. Davis, 50 F.3d 962, 965-66 (11th Cir. 1995)).

Filing a complaint constitutes protected activity under FLSA.  See Miller v. Roche Sur. & Cas. Co., Inc., 502 App'x 891, 893 (11th Cir. 2012).[6]  Adverse employment actions are not limited to "ultimate employment decisions, such as the decision to discharge an employee."  See Shannon v. Bellsouth Telecomms. Inc., 292 F.3d 712, 716 (11th Cir. 2002) (internal quotation marks and citations omitted).  An employer's conduct "falling short of an ultimate employment

---

[6] Defendants do no dispute that the Opt-in Plaintiffs engaged in protected activity by joining this lawsuit.

decision may still be cognizable . . . if it reaches some threshold level of substantiality." Id. "The relevant inquiry is whether an employer's actions likely would have 'dissuaded a reasonable worker from making or supporting a charge' against the employer." Johnson v. Advertiser Co., 778 F. Supp. 2d 1270, 1278-79 (M.D. Ala. 2011) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). Actions that reduce an employee's take-home pay qualify as tangible adverse actions for retaliation purposes. See Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1231 (11th Cir. 2006) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998); Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000)).

Generally, "close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000).

### 2.   *Substantial Likelihood Of Success On The Merits*

A party seeking a TRO must demonstrate clearly, with specific factual allegations that immediate and irreparable injury will result unless a TRO is entered. See Fed. R. Civ. P. 65(b). The request for a TRO should be denied if a party fails to adequately support its claim for injunctive relief with specific facts.

See McMahon v. Cleveland Clinic Foundation Police Dept., 455 F. App'x 874, 878 (11th Cir. 2011); Jolly v. Florida, No. 8:05-cv-1255-T-30MAP, 2006 WL 1679372, at *1 (M.D. Fla. June 13, 2006) (denying request for a TRO because vague and conclusory allegations are not sufficient to grant relief); Luedtke v. Bertrand, 32 F. Supp. 2d 1074, 1077 (E.D. Wis. 1999) (noting that conclusory allegations are not sufficient to meet the requirements for a TRO).

The Opt-in Plaintiffs offer the declarations of Spencer, Baker and Rybka to support their TRO application.[7]  These declarations assert vague and conclusory arguments to support that Defendants took adverse employment action against them.  They generally contend that Defendants reduced their compensation in some unspecified aggregate amount because the Employment Agreement requires the Opt-in Plaintiffs to relinquish to Defendants sixty percent (60%) of their tipped earnings for off-stage dances, while employees who have not joined this action are entitled to one hundred percent (100%) of their tipped earnings.  Although a reduction in compensation that an employee would have otherwise earned constitutes an adverse employment action, the Opt-in Plaintiffs did not present evidence to show a quantifiable or qualitative difference between their previous

---

[7] The Opt-in Plaintiffs chose not to offer any testimony or other evidence at the June 2, 2015, hearing.

11

compensation structure and the new terms contemplated by the Employment Agreement. See Akins v. Fulton Cty., 420 F.3d 1293, 1300 (11th Cir. 2005).[8]

In the absence of any specific evidence that shows a comparison of the independent contractor and Employment Agreement compensation structures, the Court cannot determine the financial impact of the Employment Agreement or analyze whether it constitutes an adverse employment action. At the June 2, 2015, hearing, Plaintiffs conceded that they "do not know what the [financial impact of the Employment Agreement] would be because we don't have an example of it." Tr. of June 2, 2015, Hr'g at 8:1-3. Plaintiffs also conceded that "there is an absence of facts" to show "how much [the Opt-in Plaintiffs'] compensation has been reduced" because of the new Employment Agreement. Id. at 15:21-25. The Court concludes that the Opt-in Plaintiffs have failed to show that Defendants took adverse action by reducing the amount of their compensation. See Burlington, 524 U.S. at 761; Cotton, 434 F.3d at 1231.

---

[8] The Opt-in Plaintiffs did not present evidence to show how much, on average, they earned for an off-stage dance, and how much of the money earned by an entertainer, on average, is given to non-dancer personnel at the entertainment clubs. They did not show—or even estimate—the economic effect of the compensation terms set out in the Employment Agreement. Defendants contend that the forty percent (40%) reduction in tips for off-stage dances is offset, under the Employment Agreement, by a guaranteed minimum wage and the elimination of a previous obligation to pay house fees to the clubs, and share tips with the DJ, house moms, floor staff and security.

The Opt-in Plaintiffs also argue that the Employment Agreement subjects them to "restrictive" and "punitive" scheduling practices because it prevents them from selecting their own shifts, fails to provide notice of the tip credit, coerces acknowledgment of facts that negatively impact their claims, including a representation that an adult dancer is an "artist skilled in the discipline of dance," and contains an illegal restraint of trade that forbids the Opt-in Plaintiffs from working at competing clubs.  See Pls.' Em. Mot. at 15-17.

The Opt-in Plaintiffs contend that these terms of the Employment Agreement constitute adverse employment actions, but they do not support this contention with facts or legal authority.  The Opt-in Plaintiffs fail to explain why an employment arrangement that requires an employee to submit to an employer's work schedule "dissuades a reasonable worker from making or supporting a charge" against her employer, or how the failure to provide notice of tip credits, or the required acknowledgement that they are skilled dancers—and even if they are not, how the acknowledgement itself—negatively impacts their FLSA claims.  See Burlington, 548 U.S. at 68.  The Opt-in Plaintiffs next argue that the non-compete provision of the Employment Agreement constitutes an adverse employment action

because it does not contain a geographic or temporal limitation, but this conclusion is not supported by any argument or legal authority.[9]

The Eleventh Circuit has cautioned that the request for injunctive relief should be denied if the record is scant, and the parties do not provide the court with adequate facts to assess whether a plaintiff is substantially likely to succeed on the merits. See Georgiacarry.org, Inc. v. U.S. Army Corps of Eng'rs, No. 14-13739, at 18-23 (11th Cir. June 9, 2015). The shallow facts presented by the Opt-in

---

[9] Although the Court is not required to advance arguments on behalf of the Opt-in Plaintiffs, it notes that the non-compete provision of the Employment Agreement appears to be on its face unenforceable in Georgia for a different reason than those advanced by the Opt-in Plaintiffs. Under Georgia law, a non-compete provision that prohibits an employee from working for a competitor in any capacity is unreasonable as a matter of law. See Hulcher Servs. Inc. v. R.J. Corman Ry. Co., LLC, 543 S.E.2d 461, 467 (Ga. Ct. App. 2000) (citations omitted). A restriction that prohibits an employee from working for a competitor in any capacity is unreasonable because it prevents the employee from engaging in activities that are unrelated to his work for the employer. Id. The non-compete provision in the Employment Agreement does not allow the Opt-in Plaintiffs to "work [at] competitive clubs." See Spencer Decl., Ex. A at 3. It does not limit the prohibition to working for a competitor as an adult dancer, is not limited geographically or temporally, and thus appears to be an unreasonable, and anti-competitive, restriction that is broader than necessary to protect Defendants. Id. The question that remains is whether the non-compete provision is severable from the rest of the Employment Agreement, and the answer to that question depends on whether the parties intended the remainder of the contract to be enforceable without the void portion. See Capricorn Sys., Inc. v. Pednekar, 546 S.E.2d 554, 559 (Ga. Ct. App. 2001). These are, of course, fact intensive inquiries that cannot be determined, at this stage of the proceedings, because the Opt-in Plaintiffs did not present argument or evidence to support their claim that the non-compete provision is unenforceable. Defendants also did not offer evidence or argument to support that the provision is enforceable.

Plaintiffs here do not allow the Court to fairly and adequately address whether they have shown a substantial likelihood of success on the merits by demonstrating that they engaged in activity protected under FLSA and subsequently suffered adverse action because of that protected activity. See Wolf, 200 F.3d at 1342. Without showing an adverse employment action, the opt-in Plaintiffs cannot show that the allegedly adverse actions taken by Defendants were a "but-for cause" of their decision to join this lawsuit. See Reich, 50 F.3d at 965-66.[10]

Because the Opt-in Plaintiffs have not, at this stage of the proceedings, shown a substantial likelihood of success on the merits by demonstrating a *prima facie* case of retaliation under the FLSA, the Court is not required to address the remaining factors of the preliminary injunction test. See ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd., 557 F.3d 1177, 1198 (11th Cir. 2009) ("Failure to show any of the four factors is fatal, and the most common

---

[10] Defendants claim they had a legitimate business reason to require that the Employment Agreement be executed by the Opt-in Plaintiffs. They argued further that to allow them to continue as independent contractors is equivalent to engaging in the conduct that the Opt-in Plaintiffs claim violates the FLSA. Even if the Court concluded that the Opt-in Plaintiffs have established a *prima facie* case of retaliation—which they have not—the Opt-in Plaintiffs do not offer any evidence that Defendants' decision to require them to execute the Employment Agreement was a pretext for unlawful retaliation.

failure is not showing a substantial likelihood of success on the merits.").

Plaintiffs' Emergency Motion for a TRO is denied.[11]

### III. CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiffs' Emergency Motion for a TRO [89] is **DENIED**.

**SO ORDERED** this 15th day of June, 2015.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

---

[11] The Court does not offer an opinion on whether the Employment Agreement is enforceable or whether the Opt-in Plaintiffs are entitled to preliminary or permanent injunctive relief. The Court's observations in this Order, including in footnotes 9 and 10, show that there are a variety of factual issues that were not addressed by the parties, and the Court is thus unable to address the merits of the dispute. The Court notes, however, that the circumstances of Defendants' response to the opt-in of these Plaintiffs is suspicious and troubling, urging that the question of whether these entertainers are independent contractors or employees be properly discovered and decided.